UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES SINGLETON, ) | 1:06-CV-01662 AWI JMD HC |
| ) | |
| Petitioner, ) | |
| ) | FINDINGS AND RECOMMENDATION |
| v. ) | REGARDING PETITION FOR WRIT OF |
| ) | HABEAS CORPUS |
| K. MENDOZA-POWERS, ) | |
| ) | |
| Respondent. ) | |

Petitioner Charles Singleton ("Petitioner") is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation pursuant to a judgment of the Los Angeles County Superior Court. (Pet. at 2; Answer at 1). Petitioner was convicted in December 1994 of second degree murder (Cal. Penal Code § 187) with a firearm enhancement (Cal. Penal Code § 12022.5). (Pet. at 2). Petitioner was sentenced to a total term of nineteen years-to-life.[1] (Answer Ex. 1).

On February 1, 2005, Petitioner appeared before the California Board of Parole Hearings (the

---

[1] Petitioner contends in his traverse that he was sentenced to a term of fifteen years-to-life with a concurrent sentence of fours years for the gun enhancement. However, the abstract judgment provided by Respondent states that Petitioner's total sentence was nineteen years. This is supported by both the psychological evaluation (Pet. Ex. A) and by the record of the parole hearing (Answer Ex. 2 at 1).

1  "Board") for a parole consideration hearing. (Answer at 2). The Board found Petitioner unsuitable
2  for parole. (Id).

3      Petitioner challenged the Board's denial of parole, seeking habeas corpus relief before the
4  California Supreme Court. (Pet. at 6; Answer at 2). The Supreme Court summarily denied the
5  petition on June 28, 2006. (Answer Ex. 2 at 68).

6      Petitioner subsequently filed the instant federal petition for writ of habeas corpus in the
7  Central District of California on October 25, 2006. (Pet. at 1). The case was transferred to this court
8  in November 2006, pursuant to 28 U.S.C. § 2241(d).

9      Petitioner alleges five grounds for relief: 1) that the Board's decision was a violation of his
10 right to due process as the BPH relied upon the commitment offense to deny parole; 2) the Board
11 admonished Petitioner for not admitting his guilt for the commitment offense, thereby depriving
12 Petitioner due process of the law; 3) the Board denial of parole violated Petitioner's right to have a
13 primary term set and the Board's make up violated California regulations; 4) the Board's denial of
14 parole was arbitrary and capricious in violation of Petitioner's liberty interest; and 5) use of
15 Petitioner's pre-incarceration arrests and post-incarceration disciplinary record violated his right to
16 due process of the law. Petitioner further contends that in each of the grounds for relief that his right
17 to equal protection of the law was violated.

18     On October 1, 2007, Respondent filed an answer to the petition.
19     On October 29, 2007, Petitioner filed a traverse to Respondent's answer.

## FACTUAL BACKGROUND

21     California regulations permit consideration of the circumstances of the underlying offense in
22 determining whether a prisoner is suitable for parole. *See* Cal. Code Regs., § 2402(c)(1). Thus, the
23 facts of the underlying offense are relevant to a determination of whether there was "some evidence"
24 to support the Board's finding that Petitioner posed a danger to the public safety. The Board read
25 into the record of the parole determination hearing the factual summary of the state appellate
26 decision affirming Petitioner's conviction. *See* Answer Ex. 2 at 10-19. The appellate court's
27 decision, read into the record at the parole hearing, stated:

28         Goldie Rhodes managed an apartment complex on Hillcrest. [Petitioner]
    operated and occasionally made mortgage payments on the property although his

brother held title. Goldie Rhodes, who lived across the street with his wife, Carol, collected rents for and reported to defendant. Carol Rhodes considered her husband and [Petitioner] to be friends in the past. In the past, Carol Rhodes had seen [Petitioner] driving a black Range Rover.

[Petitioner] lived in a house on Mullin Drive and made mortgage payments although his brother and sister-in-law held title. [Petitioner]'s mortgage payment record on both properties was spotty at best. In November 1991, the lender foreclosed on the Hillcrest apartments and [Petitioner] defaulted on the Mullin Drive mortgage. [Petitioner] listed the Mullin Drive property with a real estate broker who sought a sales price of $375,000; the outstanding loans were approximately $233,000. [Petitioner] later withdrew the house from the market.

Wayne [Rositano] is a government agent who works at Los Angeles International Airport. On November 7, 1991, Rositano seized $15,160 from [Petitioner]. The money was contained in three packages wrapped in duct tape. [Petitioner] told Rositano that he was returning from Dallas, where his cousin, Ronald Ambercrombie, had given him the money.

On January 3, 1991, Mark [Rothenburg], who worked for Southern California Edison Company, went to the Mullin Drive residence to disconnect the electrical service. Rothenburg encountered [Petitioner] on the property; he saw [Petitioner] holding a .22 or .25 caliber hammerless revolver. The [Petitioner] expressed an interest in retaining electrical service. At some point, Robyn Ennis, who had dated [Petitioner], saw what could have been a gun on the floor of [Petitioner]'s Jeep.

On Saturday, January 4, 1992, John Hubbard handed $790 in rent money collected from several tenants to Carol Rhodes. She gave the money to her husband. On Monday, January 6, [Petitioner] left a message on the Rhodes' answering machine. He said he wanted his money, money was precious to him, he was behind on his house note and he wanted to talk to Goldie Rhodes. On the following day [Petitioner] left another message on the Rhodes' answering machine. He reiterated that he wanted his money and left his pager number. Carol Rhodes returned [Petitioner]'s January 7 call. She told him her husband was not home but would call when he returned. [Petitioner] told Carol Rhodes that he intended to "shoot [your] husband in the butt"; that money was [precious] to him; he knew where Goldie Rhodes was and where he goes. [Petitioner] appeared to be quite angry. Goldie Rhodes telephoned his wife later that evening, he told her he had been robbed; he asked her to pick him up at a card club.

Carol Rhodes left for work on the morning of January 8, 1992. Goldie Rhodes was asleep in the back bedroom of their duplex.

At approximately 9:00 or 10:00 a.m. on January 8, [Petitioner] asked one of his tenants, Lucius Patterson, whether he had paid rent. Patterson told [Petitioner] he had given his money to John Hubbard. [Petitioner] made a telephone call, then left the Patterson apartment.

At approximately 11:30 a.m., [Petitioner] visited other Hillcrest tenants, the Lacours; he was driving a dark vehicle that could have been a Range Rover. He asked Mr. Lacour whether he had seen Goldie Rhodes.

At approximately 2:00 p.m., Patterson saw [Petitioner] knocking on the Rhodeses' door. Tommy Alcorn, who lived next door to the Rhodeses, heard someone knocking on their door at approximately 4:00 p.m. The knocking continued for some time. Sometime later, Alcorn heard Goldie Rhodes tell someone to get out. A man's voice said he wanted his money. Alcorn heard scuffling and the Rhodes' dog barking. After more time passed, Alcorn heard two gunshots.

Another of the Rhodes's next-door neighbors, Shirely Matson, heard someone knocking on the Rhodes' door at approximately 5:45 p.m. She heard a male voice say, "Open the door," or "I know you['re] in there." Later, she heard the same male voice state, "You better not say that again." About one-half hour later, she heard a gunshot. Approximately 10 minutes after that, she heard an automobile drive away.

[Petitioner] returned to the Lacours' apartment at 5:00 or 6:00 p.m. He asked

Mrs. Lacour whether she had seen Goldie Rhodes. When Terrence Porter, who also lives next door to the Rhodeses, returned from school at approximately 6:00 p.m., he saw a black Range Rover parked in front of the Hillcrest apartments; the parking lights were illuminated. Porter had seen [Petitioner] driving the Range Rover a few days earlier. Porter later heard gunshots. When the police arrived, the Range Rover was gone. Porter received threats from "Jesse," who told him not to appear in court.

Goldie Rhodes had telephoned his wife at approximately 5:00 p.m. He asked her when she was returning home. Carole Rhodes arrived home at about 8:40 p.m. The house was dark. She could not open the side door. After entering through the front door, she found a butcher knife wedged between the side door and the door jamb. When she left for work that morning, the window in the back bedroom was closed; it now was open, and the screen had been pulled away. Carol Rhodes found her husband's body lying in the hallway. She called paramedics and attempted to revive her husband. After the paramedics arrived, she listened to the answering machine. There was a message from [Petitioner]; he said, "Man, I want my money."

Goldie Rhodes had been shot twice with a .22 caliber weapon. He died from a wound to his chest.

[Petitioner] telephoned Carol Rhodes on the following day; he asked what had happened to her husband. She accused [Petitioner] of killing her husband and told him never to call again. After receiving [Petitioner]'s telephone call, Carol Rhodes called the police. [Petitioner] did not attend Goldie Rhodes' funeral and did not send a condolence card. Carol Rhodes never saw or heard from [Petitioner] again.

January 8, 9, or 10, 1992, [Petitioner] telephoned his friend, Ronald Abercrombie in Dallas, Texas. Abercrombie's mother spoke with defendant. He told her he had killed his landlord; he needed to get away and hide. [Petitioner] asked Mrs. Abercrombie for her address; she refused to give it to him. [Petitioner] continued to call Mrs. Abercrombie regularly through January and February 1992.

Abercrombie had purchased a black Range Rover. He gave it to [Petitioner] sometime after Christmas in 1991.

[Petitioner] also telephoned Abercrombie's girlfriend, Lawanda Roberts. He told Roberts that he had killed a manager or landlord from his apartment building. He sounded very nervous and upset; he asked Roberts for money.

Following the killing of Goldie Rhodes, the police tried unsuccessfully to locate [Petitioner]. They discovered that he no longer went or collected rent money for the Hillcrest apartments.

David Hunt is [Petitioner]'s cousin. In January 1992, Hunt was in the California State Prison in Ione. His girlfriend was Tiffany Williams. Hunt and [Petitioner] would telephone Williams at the same time on two separate lines. Williams then served as a messenger for them. The prison authorities recorded Hunt's calls.

On January 11, 1992, Williams related to Hunt that there was a man who lived "next door to where it happened"; [Petitioner] wanted to know whether Hunt could "set him up". Hunt had Williams tell [Petitioner] to talk to a man named "Marlin." [He then had] Williams ask [Petitioner] why he had not eliminated the man himself. Williams asked [Petitioner] what happened to the gun; he said Jess had it.

The conversation continued in this vein, with Hunt having Williams tell [Petitioner] "not to tell on himself," "if he could stay award until I came home, I'll take care of everything," and "the time is better to roll than to try to stay." Williams related that [Petitioner] said he was waiting for identification; Hunt had her tell [Petitioner] not to wait for identification and not to talk with anyone because "that's why he's in the position that he's in 'cause he talks too much." He was not to "tell nobody why he [was] out of town" and was to "move from place to place." On January 12, 1992, someone placed a collect call from the state prison in Ione to the home of [Petitioner]'s mother.

[Petitioner] moved to Atlanta, Georgia in late January or early February 1992. He traveled there by bus from Alabama. His girlfriend and son flew in from Canada.

> [Petitioner] used the name "Lamont Williams" while he lived in Georgia; he obtained employment under that name... [Petitioner] was arrested in the Atlanta area on August 21, 1992.

(Answer Ex. 3 at 2-6)

## DISCUSSION

### I.  Jurisdiction

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. While Petitioner's custody arose from a conviction in the Los Angeles County Superior Court, an application for writ of habeas corpus "may be filed in the district court for the district wherein such person is in custody." 28 U.S.C. § 2241(d). Petitioner is currently in custody at Avenal State Prison, located in Kings County. Kings County is within the jurisdiction of this court. *See* 28 U.S.C. § 84(b). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment. Lindh v. Murphy, 521 U.S. 320, 326-327 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)). The instant petition was filed on August 10, 2005 and is consequently governed by the provisions of the AEDPA, which became effective April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003).

### II.  AEDPA Standard of Review

While Petitioner is not challenging the underlying state court conviction, Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Thus, 28 U.S.C. § 2254 remains the exclusive vehicle for Petitioner's habeas petition since he satisfies the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir. 2006) (quoting White

1  v. Lambert, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that, "[s]ection 2254 'is the exclusive
2  vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even
3  when the petitioner is not challenging his underlying state court conviction'").

4        Since Petitioner filed his petition after the effective date of AEDPA, his petition for habeas
5  corpus "may be granted only if he demonstrates that the state court decision denying relief was
6  "contrary to, or involved an unreasonable application of, clearly established Federal law, as
7  determined by the Supreme Court of the United States."" Irons v. Carey, 505 F.3d 846, 850 (9th Cir.
8  2007) (quoting 28 U.S.C. § 2254(d)(1)); see Lockyer, 538 U.S. at 70-71.

9        As a threshold matter, this Court must "first decide what constitutes 'clearly established
10 Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71
11 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this
12 Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of
13 the time of the relevant state-court decision." Id. (quoting Williams, 592 U.S. at 412). "In other
14 words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or
15 principles set forth by the Supreme Court at the time the state court renders its decision." Id.

16       Finally, this Court must consider whether the state court's decision was "contrary to, or
17 involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72,
18 (quoting 28 U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant
19 the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
20 question of law or if the state court decides a case differently than [the] Court has on a set of
21 materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72.
22 "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court
23 identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies
24 that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.  "[A] federal court may
25 not issue the writ simply because the court concludes in its independent judgment that the relevant
26 state court decision applied clearly established federal law erroneously or incorrectly. Rather, that
27 application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable
28 application" inquiry should ask whether the state court's application of clearly established federal law

was "objectively unreasonable." Id. at 409.

Petitioner bears the burden of establishing that the state court's decision is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir.1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  *See* Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859, 123 S.Ct. 231 (2002), *rehearing denied*, 537 U.S. 1149, 123 S.Ct. 955 (2003).

### III.     Review of Petitioner's Claim

#### A.     Grounds One and Four

Petitioner's first ground for relief is that his right to due process was violated by the Board's continual reliance on his commitment offense in making their determinations of parole.  As his fourth ground for relief, Petitioner contends that the BPH's "arbitrary and capricious" denial of parole violated his liberty interest in parole.  Respondent contends that these claims are without merit as Petitioner has been afforded all the due process rights he is entitled to.  Specifically, Respondent rejects that the "some evidence" standard is applicable and argues that Petitioner was entitled only to notice and an opportunity to be heard at the hearing.  As the question of whether "some evidence" existed to support the Board's denial of parole is dispositive to the merits of these claims, the Court addresses both grounds for relief in this section.

Petitioner raised these claims in a petition for writ of habeas corpus to the California Supreme Court, which summarily denied Petitioner's claims.   As a result of the unexplained rejection, this Court conducts an independent review of the record to decide whether the state court's decision was objectively reasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

"We analyze a due process claim in two steps.  '[T]he first asks whether there exist a liberty or property interest which has been interfered with by the State; the second examines whether the

procedures attendant upon that deprivation were constitutionally sufficient.'" Sass, 461 F.3d at 1127 (citation omitted). The United States Constitution does not, by itself, create a protected liberty interest in a parole date. Jago v. Van Curen, 454 U.S. 14, 17-21 (1981). However, where a state's statutory scheme for parole contains mandatory language, the presumption exist "that parole release will be granted' when or unless certain designated findings are made, and thereby give rise to a constitutional liberty interest.'" McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002) (quoting Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 12 (1979) in holding that California's parole scheme gives rise to a cognizable liberty interest in release on parole). California Penal Code section 3041 contains the requisite mandatory language, thus vesting in California prisoners "whose sentence provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." Irons, 505 F.3d at 850; *see* McQuillion, 306 F.3d at 903; *see also* Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003). Even a prisoner who has not yet been granted a parole date has a constitutionally protected liberty interest in a parole date. Sass, 461 F.3d at 1123.

Notwithstanding a prisoner's liberty interest in a parole date, a parole release determination is not subject to all of the due process protections of an adversarial proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987); *see also* Greenholtz, 442 U.S. at 12 (explaining that due process is flexible and calls for procedural protections as demanded by the particular situations). "[S]ince the setting of a minimum term is not part of a criminal prosecution, the full panoply of rights due a Petitioner in such a proceeding is not constitutionally mandated, even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir.1987). At a state parole board proceeding, an inmate is entitled to receive advance written notice of a hearing. Pedro, 825 F.2d at 1399. Additionally, the inmate must be afforded an "opportunity to be heard" and told why "he falls short of qualifying for parole." Greenholtz, 442 U.S. at 16.

"In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation of good time does not comport with 'the minimum requirements of procedural due process' unless the findings of the prison disciplinary board are supported by some evidence in the record.'" Sass, 461

F.3d at 1128 (citations omitted).  Contrary to Respondent's contentions otherwise, the Ninth Circuit has consistently held that the same standard of "some evidence" that applies to the revocation of good time also extends to parole determinations.  Irons, 505 F.3d at 851.  The "some evidence" standard as applied to parole determinations is clearly established Federal law, pursuant to the decisions of the Supreme Court.  Id.; Sass, 461 F.3d at 1128-1129.  This evidentiary standard prevents arbitrary deprivations of the prisoner's liberty interest without imposing undue administrative burdens or threatening institutional interests.  Superintendent v. Hill, 472 U.S. 445, 455 (1985).  Furthermore, in reviewing the record and determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence.  Sass, 461 F.3d at 1128 (citing Hill, 472 U.S. at 455-456). Rather, the relevant inquiry is whether there is any evidence in the record that could support the Board's decision.  Sass, 461 F.3d at 1128.

The discussion of whether "some evidence" exists to support the Board's conclusion, that Petitioner posed a current unreasonable risk of danger to the public safety, is framed by the state's statutes and regulations governing parole suitability determinations.  Irons, 505 F.3d at 851; Briggs, 334 F.3d at 915.  California law provides that after an eligible life prisoner has served the minimum term of confinement required by statute, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for" the prisoner.  Cal. Penal Code § 3041(b).  "[I]f in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison," the prisoner must be found unsuitable and denied parole.  Cal. Code Regs., § 2402(a); see In re Dannenberg, 34 Cal.4th 1061, 1078, 1080 (Cal. 2005).  The Board decides whether a prisoner is too dangerous to be suitable for parole by applying factors set forth in the California Code of Regulations.  See 15 Cal. Code Regs., tit. 15 § 2402; Irons, 505 F.3d at 851-852; Biggs, 334 F.3d at 915-916.  The regulation's criteria states that:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole.  Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented;

> the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstance which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

15 Cal. Code Regs., tit. 15, § 2402(b)

Factors supporting a finding of unsuitability for parole include (1) the underlying offense was carried out in an "especially heinous, atrocious or cruel manner"; (2) a record, prior to incarceration for the underlying offense, of violence; (3) a history of unstable relationships with others; (4) sadistic sexual offenses; (5) a lengthy history of severe mental problems related to the underlying offense; (6) serious misconduct in jail. Cal. Code Regs., tit. 15, § 2402 (c)(1)-(6); also In re Shaputis, 82 Cal.Rptr.3d 213, 225 n. 14 (Cal. 2008)(holding that "some evidence" standard was met where Petitioner failed to gain insight into his previous violent behavior and to take responsibility for the commitment offense).

      The Ninth Circuit has expressed reservations about denying parole based solely on immutable factors but permitted such reliance in certain circumstances. Briggs v. Terhune, 334 F.3d 910, 916-917 (9th Cir. 2003)(stating that, "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct of prior imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."); Sass, 461 F.3d at 1139-1140 (Reinhardt, J., dissenting); Irons, 505 F.3d at 853-854 (holding, in discussing Sass and Briggs, that "[a]ll we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.").

      After reviewing the record, this Court concludes that the Board's decision was supported by "some evidence." Thus, Petitioner's rights were not violated as he received all the process due to him under the governing law. See Sass, 461 F.3d at 1129. Here, the Board's decision rested on several factors. First, the Board relied on the commitment offense and found that the offense was committed in a violent and brutal manner, displaying a disregard for human life. (Answer Ex. 2 at 60-61). Secondly, the Board reiterated Petitioner's history of pre-incarceration arrests. (Id. at 57).

1  Thirdly, the Board concluded that Petitioner's psychological evaluation was not totally supportive of
2  release. (Id. at 57-58). Fourthly, the Board found that Petitioner's parole plans were unverified. (Id.
3  at 59-60). Lastly, the Board noted the opposition by the District Attorney's Office. (Id. at 60). In
4  discussing positive factors weighing in favor of finding Petitioner suitable for parole, the Board
5  commended Petitioner's completion of vocational training in dry cleaning and his disciplinary
6  record–noting that the last major disciplinary citations was in 1995. (Id.). However, the Board
7  ultimately concluded that, "these positive aspects of his behavior do not outweigh the factors of
8  unsuitability."

9       As noted above, the Board relied in part of the commitment offense to find Petitioner
10  unsuitable, reading into the record the factual summary contained in the appellate court opinion
11  affirming Petitioner's conviction. (Id. at 10-19). The factual summary revealed that the killing was
12  motivated by Petitioner's desire to obtain $790 in rent that the victim collected for Petitioner. (Id. at
13  12). It also stated that the victim was shot twice. (Id. at 16). These facts were reiterated by the
14  District Attorney's Office in their objection to granting parole, noting that the motive for the crime
15  was trivial and the victim was particularly vulnerable as he was in his home without a means of
16  escape. (Id. at 48).

17       The Board also relied on the psychological evaluation, quoting the report as stating that,
18  "[Petitioner] has upgraded vocationally but has not been involved in any self-help programming."
19  (Id. at 39). The report further concluded that Petitioner posed a moderately low risk of future
20  violence. (Id. at 40). In explaining their subsequent finding that Petitioner was unsuitable for parole,
21  the Board noted that the psychological report, "indicates a need for a longer period of observation,
22  clarification, and evaluation or treatment. [Petitioner] apparently has not completed the necessary
23  programming which is essential to his adjustment and needs additional time to gain such
24  programming. He has failed to adequate participate in self-help such things as anger management."
25  (Id. at 61).

26       Additionally, the Board noted that Petitioner's parole plans were "unclear and unverifiable,
27  inconclusive." (Id. at 59). There was a discrepancy as to where Petitioner would be employed.
28  Petitioner insisted at the parole hearing that he had an employment offer from Pestco but the only

letter offering Petitioner a job was from a company named Step Above Pet Shop. (Id. at 27-28, 59). More importantly though was the lack of verified residency plans. Petitioner told the parole board that he would be living with his mother but the support letter from Petitioner's mother did not verify that Petitioner could come live with her. (Id. at 43-44, 59).

As a whole, this evidence is sufficient to establish that it would not be unreasonable for a court to conclude that there was "some evidence" supporting the Board's determination that Petitioner posed an unreasonable risk of danger to society if released from prison. *See* Cal. Code Regs., tit. 15, § 2402(b) ("Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability"). Furthermore, the Board's reliance on the commitment offense is not violative of Petitioner's right to due process of the law under the governing precedents. The Ninth Circuit, in Irons, held that sole reliance on the commitment offense comports with the requirements of due process where the parole board's determination of unsuitability came prior to the prisoner serving the minimum number of years required by his sentence. Irons, 505 F.3d at 853. The application of Irons's holding to Petitioner's case would lead to the conclusion that Petitioner's due process rights were not violated even where the Board had relied solely on the commitment offense in finding Petitioner unsuitable for parole. Petitioner was convicted in December 8, 1994 of the commitment offense and sentenced to nineteen years-to-life. Thus, Petitioner would have reached his minimum sentence in 2013, well after the February 2005 hearing Petitioner is currently challenging. Under the governing precedent, as stated in Irons, the Board's reliance on Petitioner's commitment offense did not violate Petitioner's right to due process.

**B.    Ground Two**

In his second ground for relief, Petitioner contends that the Board violated his right to due process when the Board admonished him for not admitting guilt for the crime. Petitioner correctly cites to California Penal Code section 5011 for the proposition that, "[the Board] shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed." Cal. Penal Code § 5011(b). Petitioner raised this claim in a petition to the California Supreme Court, which issued a summary denial of Petitioner's claim. As a result of the unexplained rejection, this

1  Court conducts an independent review of the record to decide whether the state court's decision was
2  objectively reasonable.  Himes, 336 F.3d at 853.

3  Contrary to Petitioner's assertions otherwise, the Board did not admonish Petitioner for not
4  admitting guilt.  The only times the Board mentioned the absence of an admission of guilt was to
5  note that Petitioner claimed that he was innocent  (Answer Ex. 2 at 19) and in quoting the
6  psychological evaluation (Answer Ex. 2 at 39, 58).  The psychological evaluation stated that
7  "[Petitioner]'s behavior and motivation for the offense and the specific sequence of events is still
8  unclear owing in part to the inmate's denial of significant involvement in the crime.  Given his
9  conviction by the jury, the inmate must be viewed as not taking responsibility for his behavior as
10 focusing blame onto others and as seeing himself as the victim of an unjust system."  (Id. at 58).

11 Additionally, California regulations mandates that the Board consider "[a]ll relevant, reliable
12 information available to the panel."  Cal. Code Regs., tit. 15, § 2402(b).  Among the explicitly stated
13 factors for the Board to when determining a petitioner's suitability for parole are, "past and present
14 attitudes toward the crime."  Id.  California regulations also permits the Board to consider whether a
15 prisoner has displayed signs of remorse as one of the circumstance tending to show suitability for
16 parole. Cal. Code Regs., tit. 15, § 2402(d)(3).  Specifically, the Board may consider if a "prisoner
17 performed acts which tend to indicate the presence of remorse, such as attempting to repair the
18 damage, seeking help for or relieving the suffering of the victim, or indicating that he understands
19 the nature and magnitude of the offense."  Id.

20 Consequently, the Board was acting within its governing regulations when it considered the
21 psychological evaluation's finding that Petitioner failed to demonstrate adequate remorse in not
22 taking responsibility for the crime and thus did not meet this particular suitability factor.  More
23 importantly though, Petitioner has been afforded all of his rights under the Due Process Clause as
24 there exists some evidence to support the Board's finding that he posed an unreasonable risk of
25 danger to the public.

26 **C.    Ground Three**

27 Petitioner contends, as his third ground for relief, that the Board violated his right to have a
28 primary term set when the Board denied him parole.  Petitioner additionally argues that the make up

of the Board violates California regulations. Petitioner raised this claim in a petition to the California Supreme Court, which issued a summary denial of Petitioner's claim. As a result of the unexplained rejection, this Court conducts an independent review of the record to decide whether the state court's decision was objectively reasonable. Himes, 336 F.3d at 853.

Petitioner's claim that his rights has been violated by the failure to set a primary term fails for two reasons. First, Petitioner is in effect arguing that the Board mistakenly applied state law. As "federal habeas corpus relief does not lie for errors of state law," Petitioner's claim cannot constitute a basis for habeas relief. Estelle v. McGuire, 502 U.S. 62, 67 (1991)(internal citations omitted); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a constitutional violation, may not be corrected on federal habeas"). For this reason, Petitioner's allegation, that the Board's make up also violates California regulations, must also be rejected as his claim is an issue of state law which is not cognizable on federal habeas review. Estelle, 502 U.S. at 67(quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)). Petitioner's broad assertion of a violation of his due process rights does not transform his claim into a federal one as placing a "due process" label on an alleged violation fo state law does not entitle Petitioner to federal relief. Langford v. Day, 110 F.3d 1386, 1388-89 (9th Cir. 1996). Furthermore, Broad, conclusory allegations of unconstitutionality are insufficient to state a cognizable claim. Jones v. Gomez, 66 F.3d 199, 205 (9th Cir.1995)

Secondly, Petitioner is wrong in asserting that the Board violated state law when it declined to set a parole release date. California law entitles Petitioner to a base term only *after* Petitioner is found suitable for parole. In re Stanworth, 33 Cal.3d 176, 183 (Cal. 1982)(holding that under both the indeterminate and determinate sentencing law, a life prisoner must first be found suitable for parole prior to setting a parole date). Since Petitioner was deemed unsuitable for parole, he was not entitled under California law to the setting of a base term or parole date. *See* Cal. Code Regs., tit. 15, §§ 2401, 2402(c); *see also* Connor v. Estelle, 981 F.2d 1032, 1033 (9th Cir. 1992). Thus, Petitioner's rights were not violated by the Board's failure to set a primary term.

**D.     Ground Five**

In his fifth ground for relief, Petitioner contends that the BPH's use of his pre-incarcerations

arrests and disciplinary record as reasons to deny parole constitutes a violation of his right to due process.  Petitioner raised this claim in a petition to the California Supreme Court, which issued a summary denial of Petitioner's claim.  As a result of the unexplained rejection, this Court conducts an independent review of the record to decide whether the state court's decision was objectively reasonable.  Himes, 336 F.3d at 853.

Petitioner's contention must be rejected as California regulations permits the consideration of all relevant and reliable information available to the Board.  Cal. Code Regs., tit. 15, § 2402(b).  Among the enumerated factors for the Board to consider is Petitioner's "past criminal history, including involvement in criminal misconduct which is reliably documented." Id.  Here, the Board considered Petitioner's past criminal misconduct as documented by his arrest record and was thus acting pursuant to the legal framework provided by California regulations.

As California regulations permits the consideration of institutional behavior as a factor tending to support suitability or unsuitability for parole, it was not error for the Board to consider Petitioner's post-commitment disciplinary record in determining whether Petitioner was suitable for parole.  Cal. Code Regs., tit. 15, §§ 2402(c)(6) and (d)(9).  Additionally, Petitioner mischaracterizes the Board's findings with regards to his post-commitment disciplinary record.  While the Board noted that Petitioner had received several minor disciplinary citations, the Board also stated that "the [Petitioner] should be commended for his advancing his educational abilities, for completing vocational dry cleaning, *for his institutional behavior having had only one 115 and that was back in 1995 so basically 10–or nine and half years of being 115 free.  However, these positive aspects of his behavior do not outweigh the factors of unsuitability.*"  (Answer Ex. 2 at 60)(emphasis added).  This statement plainly illustrates that the Board viewed Petitioner's post-incarceration disciplinary record as a positive factor.

Petitioner's claim then is that the Board incorrectly weighed such evidence in reaching their decision.  Moreover, "[t]he requirements of due process are satisfied if some evidence supports the decision...Ascertaining whether this standard is satisfied does not require an examination of the entire record, independent assessment of the credibility of witnesses, or *weighing of the evidence*."  Hill, 472 U.S. at 455 (emphasis added).   As discussed above "some evidence" supports the Board's

finding that Petitioner posed an unreasonable risk of danger to the public safety. Consequently, Petitioner's right to due process of the law was not violated when the Board denied Petitioner parole.

**E.     Equal Protection**

In each of his grounds for relief, Petitioner alleges that his equal protection rights have been violated by the Board. Petitioner raised these claims in a petition for writ of habeas corpus to the California Supreme Court, which summarily denied Petitioner's claims. As a result of the unexplained rejection, this Court conducts an independent review of the record to decide whether the state court's decision was objectively reasonable. Himes, 336 F.3d at 853.

"The equal protection clause directs that 'all persons similarly circumstanced shall be treated alike.'" Mayner v. Callahan, 873 F.2d 1300, 1301 (9th Cir. 1989)(citing F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920)). Where a petitioner fails to allege any facts establishing that the laws were applied unevenly in a systematic manner or that the Board drew any distinction among similarly situated prisoners, the petitioner fails to state an equal protection claim. Caswell v. Calderon, 363 F.3d 832, 837-838 (9th Cir. 2004)(affirming district court's conclusion that petitioner's equal protection claim was futile where petitioner failed to argue either that the parole board drew any distinctions among similarly situated prisoners, treated petitioner differently because of membership in a protected class, or unevenly applied the law in a systematic manner); McQueary v. Blodgett, 924 F.2d 829, 835 (9th Cir. 1991).

Here, the petition does not contain any allegations that the Board drew distinctions among similarly situated prisoners, treated Petitioner differently based on membership in a protected class, or unevenly applied the law in a systematic manner. Consequently, Petitioner has failed to state a cognizable equal protection claim.

**RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for Respondent.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(c). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:     October 22, 2008**                    **/s/ John M. Dixon**
                                          UNITED STATES MAGISTRATE JUDGE